C. H. COHEN, for defendant.

---

SANDERS *et al. v.* SLAUGHTER, administrator.

1. It does not appear that there was any abuse of discretion by the judge below in refusing the injunction and the appointment of a receiver, and therefore, under the repeated rulings of this court, the judgment must be affirmed.

2. This case differs from that of *McCook et al. v. Pond, adm'r*, 72 *Ga.* 150. It appeared in that case that an appeal was taken from the order of the court of ordinary granting the administrator leave to sell the land, and the appeal was dismissed upon his own agreement that he would sell under the order only a portion of the land. He was restrained from violating his agreement thus made. In the present case an attempt is made to attack collaterally the judgment of the court of ordinary granting leave to sell, without alleging any special reason why this should be done.

*Judgment affirmed.*

March 26, 1892. By two Justices. Argued at the last term.

Injunction and receiver. Administration. Judgment. Before Judge Miller. Butts county. At chambers, November 30, 1891.

Mrs. Elder, Mrs. Heath and T. J. Sanders filed their equitable petition against Slaughter as administrator of Troy S. Sanders, deceased, praying for injunction and receiver for the estate of Troy Sanders, for the removal of Slaughter, the increase of his bond as administrator, etc. To the refusal of this prayer the plaintiffs excepted, assigning numerous grounds of error.

The petition alleged: Mrs. Elder and Mrs. Heath are the children of T. J. Sanders and sisters of Troy Sanders. They and T. J. Sanders are all the heirs of Troy Sanders, late of Butts county, who died in January, 1891, intestate, leaving an estate amounting to upwards of $28,000, according to the return of the appraisers, except the wife of the defendant Slaughter, who also is a sister of Troy and daughter of T. J. Sanders. When Troy Sanders died he owed no debts, and the expenses of his burial and other expenses of the estate are all paid. All the heirs are of full age and capable of receiving and managing their own interest in the estate, and there is no reason why they should not have it. Parts of the estate were eight bonds, four State bonds of $1,000 each and four railroad bonds of the same amount, and when Troy Sanders died they were at par value. There was also $800 in money. While there were no debts, and

the bonds, money, notes, land and other property were capable of an easy division in kind, and while it is true that the intestate before his death expressed a wish that all of his property should be divided among his heirs without the expense of an administrator, and that the bonds should be equally divided among them, Slaughter, by artfully representing to the husbands of Mrs. Elder and Mrs. Heath that some one should collect the notes and accounts and otherwise have authority to manage, control and administer the estate, induced Elder and Heath [to consent to administration by him], without the consent or knowledge of petitioners and without their ratification of any of the acts of Slaughter and of Elder and Heath, by fraudulently representing and promising to them, if they did not on behalf of petitioners interpose any objection to his appointment as administrator, that immediately upon his qualification as such he would pay over to petitioners their share of the money and bonds collected, pretending fraudulently in all this that he would fully and in good faith comply with the wishes of deceased in the premises. Induced by these fraudulent representations to Heath and Elder and acquiesced in for the time by petitioners, Slaughter obtained letters of administration, giving bond for $12-000 only, with Pound and Mallet as his sureties. As soon as he qualified, his whole conduct changed towards petitioners. Instead of delivering them the bonds he absolutely refused to do it, and so far as Thomas J. Sanders was concerned, not only refused to deliver to him or any one for him his share of the bonds, but refused to pay him any part of his share of the money, asserting that he would neither do that nor ever pay over or deliver to him any of the estate, except at the end of the law, threatening that if he were interrupted or bothered he would let the estate go to law and keep it there for ten years, when he knew that petitioner

Sanders was very poor and feeble and wholly dependent upon his part of the estate for a living. Under an order of the court of ordinary, obtained without objection for the reason aforesaid, that he would properly proceed with the distribution and properly sell the property, Slaughter advertised it in such a way that purchasers would before the day of sale know scarcely anything of the property. Petitioners believe that he did this fraudulently and for the purpose of deceiving others and obtaining an undue and selfish advantage. He did not in the advertisement give the character of the houses or improvements, or even a definite location of the property, whereas in fact there are valuable houses, stores and other improvements on it, and the property not improved is favorably located; and thus the property is so defectively and insufficiently advertised that it will not sell for its value to others, and Slaughter well knew that petitioners are not able to purchase it and pay for it according to the terms advertised, which are one half cash, but is willfully, fraudulently and without necessity to sell the land, and against the wishes and interests and to the injury of petitioners, threatening and clearly intending to do so, and will no doubt sell the same unless he is restrained. From his past and present conduct they charge that he is seeking to get all the estate into money, and then will fail, neglect and refuse to settle with them, and misappropriate the property and money. As he has been regularly appointed administrator they have no remedy in law except as against him and his sureties, and even if the sureties were responsible in the amount of the bond, the bond is greatly too small, the estate being clearly worth $20,-000; but Slaughter and his securities together are not worth $20,000 over the homestead and exemption allowed and their several liabilities. And so should Slaughter fail to account to petitioners and otherwise

mismanage and misappropriate the estate, or such part as is in excess of the bond and the responsibility of himself and sureties, petitioners would be wholly remediless. By amendment they alleged that the estate was appraised at $44,954.79 instead of $28,000; and they prayed that Slaughter be required to increase his bond to double the appraised value of the property, or to such other sufficient amount as the court might deem necessary for the protection of the estate, that he be removed from his office, and that commissioners be appointed to partition the property, etc. They also alleged that after he qualified as administrator he took charge of all the estate appraised, and has now charge of all of it except such as by his answer it appears he has delivered to petitioners and otherwise paid out and disposed of. He was guilty of acts of waste and mismanagement, in that he sold at private sale without authority the pistol of deceased, and has refused to sell, as required by law, the gold watch and chain, office chair, table and library of deceased, of the value of $150, but retains the same in his possession. Attached as an exhibit was a copy of the inventory of the estate of Troy Sanders, which, exclusive of notes and accounts, amounted to $18,730.34. The notes and accounts amounted to $44,954.79, of which $14,214.92 were classed as desperate and the remainder doubtful. The cash on hand at the testator's death was $684.80 cash received from personal property sold, and rents $380.34, and from collections on accounts and notes $697.70. There was also attached a copy of the advertisement for sale of the lands of the estate. The description of the lands was simply as of so much land in certain districts, and of certain town property as being a lot known as the Daughtry stable lot, a lot known as lots numbers eighteen and nineteen purchased of M. S. Barber, a lot known as number twenty purchased of

C. T. Ezell, a lot known as the storehouse lot, a lot known as the W. D. Jolly lot, and a lot purchased of Mrs. Mary T. Smith.

Defendant demurred to so much of the petition as related to settlement and distribution of the estate, upon the ground that as appeared from the petition he was appointed in 1891, and had had only —— months to ascertain the condition of the estate and collect assets belonging to it, while under the law he has twelve months to ascertain its condition and prepare for distribution, and could not be sued for settlement until after the expiration of that period. He answered: It is not true that he induced Elder and Heath, who represented their wives, to consent that he might administer the estate, nor did he desire to administer it, but on the contrary, the day after the intestate was buried, Heath, in the presence of Elder, proposed that Elder and defendant should see the ordinary and ascertain what should be done touching the management of the estate. They consulted the ordinary who referred them to an attorney, and the attorney advised them that in view of the condition of the estate and the mental condition of T. J. Sanders, who is very old and an imbecile incapable of managing his property, there should be administration on the estate; whereupon Heath and Elder, representing and acting for their wives, and defendant representing his, consented that there should be administration, and then and there employed counsel to advise the administrator, and agreed on the fee to be paid counsel for such service. While engaged in discussing the subject Elder said he could not give bond, and as Heath lived out of the county he could not look after the administration. Heath proposed that all three should administer, but defendant objected. It was then agreed that defendant should take out letters, and he obtained temporary letters and applied for permanent. Elder

and Heath then had another conversation with him.
They asked him if he would take the administration
for less than regular commissions, and when he refused
to do so, asked if he would consent that they might
procure some other person to administer who would do
so for less than regular commissions. He consented to
this, and with his consent Elder and Heath approached
one Gibson, but failed to procure his consent to admin-
ister. They then agreed that defendant should admin-
ister. He told them he would not administer for less
than full commissions as he knew the collection of the
accounts would entail very great trouble. He did not
agree with them to pay out the money on hand imme-
diately, divide the bonds and other property without
sale, and divide the collections as fast as received; but
assured them that he would administer according to
law and to the best of his ability. He was advised by
the counsel mentioned above against a division of the
money as fast as the same should be received, as it
would be safer to look into the condition of the estate
before doing so. He did deliver to the heirs two bonds
each, one State bond and one railroad bond, except to
T. J. Sanders whose share is still in defendant's hands.
The State bonds have not declined in value, but the
railroad bonds have, until recently, and are now re-
covering in value. These bonds were appraised at
par, and were so received and receipted for by the
heirs. He made application regularly for leave to
sell the realty, and legal notice was given, and at
a regular term an order was passed authorizing this
sale. The charge that the real estate was imperfectly
advertised by defendant for the purpose of getting an
advantage of the heirs or with the view of becoming
the purchaser, is untrue. He never expected to become
the purchaser of any of it, and so informed persons
who approached him on the subject. He believed that

the first Tuesday in November would be a most suitable time for the sale, because money is more plentiful at that time and because persons who might buy the farm lands would have time to make arrangements for farming on them another year. This fact was made known to the ordinary on the last day for getting advertisements in the county paper; the ordinary reminded him that if he desired to sell at that time, the advertisement should go to the paper of that day. Defendant was in the act of leaving on business, and requested the ordinary to write the advertisement and have the same published. He did leave, and upon his return found the advertisement in the paper. The ordinary copied into the advertisement the description by the appraisers of the real estate, and defendant supposed the description was correct and sufficient. The advertisement does put every person desiring to purchase on notice of the locality, etc. of the property, for although there is not a full description the public know the "Troy Sanders lands" in the county, and the town lots could not be more easily identified than by the description given in the advertisement; if the description of the farm lands is not full enough, this could have been remedied by a readvertisement at defendant's cost, and would have been done had complaint been made against the sale on this ground; but such was not the ground of complaint, there being another reason for opposing the sale. On November 2d Heath and Elder approached defendant and asked what he proposed to do in regard to the sale. He had heard of threats to enjoin the sale, and replied that he proposed to sell unless enjoined, that their wives or they for their wives could buy lands if they desired, to their full shares or more, or he would, so soon as the sales were over and cash payment paid him, pay over to their wives their full share of all the moneys collected and of the proceeds of the sale. They

then asked him what about the share of T. J. Sanders, and he replied he would not pay that share to T. J. Sanders, but would pay whatever amount was necessary to his support in addition to the income he had from his own property.   They then claimed to have a power of attorney from said Sanders authorizing them to act for him, and asked that the amount be paid to them, which he refused.   In this conversation there was no intimation that the sale would be opposed, and if he had agreed to pay over to them the share of T. J. Sanders the sale would have gone on, notwithstanding the objections urged in a petition previously prepared at their instance.   T. J. Sanders is almost if not quite an imbecile, and petitioners and their husbands so believe; they know that he is totally incapable of managing his affairs.   This fact was well known to the intestate, and a very short time before his death he said to defendant and others, "Look after father's share, and there will be more for you some day."   Should T. J. Sanders die, Mrs. Heath and Mrs. Elder and defendant's wife would be his sole heirs, unless a child or children and the wife of Cornelius Sanders, his adult son, should be living. T. J. Sanders boards with Elder, and is under the absolute control of Elder and Heath, who are both insolvent.   Cornelius Sanders went to Texas several years ago, where he died, leaving a widow and probably children, and defendant has heard a report that his wife is still living and that probably he left a living child or children who may claim to be heirs of T. J. Sanders. On this subject defendant has not been able to get definite information.   His interest in caring for his wife's welfare, if there were nothing to prevent, would induce him to refuse to turn over to Heath and Elder the share of T. J. Sanders, without security or guaranty that the funds would be used for the support of T. J., and what might be left at his death would be forthcoming for

distribution. T. J. Sanders is eighty-two years old, and his estate should be carefully kept and managed. Defendant will cheerfully turn over his share to any good person who is responsible, to manage it for him. If T. J. Sanders claimed his share of the estate now ready for distribution, he could apply to the ordinary to have defendant settle with him, when the question of his fitness to manage his estate could be determined, and if the court should direct that his share should be paid him it would be done without objection from defendant. Defendant never agreed to divide the estate in kind, except as to the personalty, and take commissions only on money collected and compensation for turning over the land. The estate could not be divided in kind because of the character of the realty; and the notes and accounts amounting to something like $10,000, but not worth more than $1,000, could not be divided. His bond is abundantly sufficient. He is worth above all liabilities $5,000, and his sureties $23,000. The value of the property in his hands to be administered, including the two bonds, the share of T. J. Sanders, putting a proper valuation on the notes and accounts, is $11,-342.96. If his bond is insufficient the court of ordinary will give ample protection. Petitioners filed an application to that court to have defendant strengthen his bond, and on the second day of November, 1891, when they could have procured a judgment requiring him to increase his bond if it were necessary, on their own motion had the proceedings dismissed. The notes and accounts would be comparatively worthless should they be sued, but $1,500 may be collected of them together with what has been already collected, by proper indulgence and management. The intestate did express a desire to have his property divided, and suggested certain persons to act; but petitioners, through their husbands who were acting for them, after consulting counsel and

looking into the condition of the estate, determined that the administration was necessary. Not only have petitioners acquiesced in all that has been done by their husbands, but defendant is satisfied they act only by and through their husbands. Since the filing of the petition defendant has had notice of one outstanding claim against his intestate's estate of $6 or more, and there has been pleaded to a suit on one of the accounts a set-off in excess of the account to the amount of a little over $30.

Upon the hearing evidence was introduced for petitioners to this effect: With the money in possession of the administrator the lands of the estate could be divided in kind without injury to any of the heirs. T. J. Sanders has asked Slaughter twice, and directed Heath and Elder with power of attorney to ask for help, but Slaughter refuses him any part of his interest and declines to help him in any way. He is nearly eighty-three years old, unable to work, can hardly see, and has no income except a small farm from which he receives a bale of cotton as rent, and two or three small houses bringing him annually about $25. Neither his board nor clothes are paid for, nor has he a dollar in the world. The lands of the estate can be divided in kind, and it would be to the best interest of the heirs so to divide them. To sell the land at public outcry during the present monetary stringency would be detrimental to the interest of the heirs. Outside of the allegations in the petition of the administrator for the sale of the lands, the ordinary had no information of the existence of any debts and as to the necessity of selling the lands to pay debts or distribute ; at the hearing of the application no evidence or investigation was had upon these facts, and the order was passed because of the allegation in the petition, and because no objection was filed. The heirs of the intestate are all of full age and capable of

managing their affairs. While the capacity. of T. J. Sanders is doubtful, a jury has recently declared him so capable. The intestate owed only $3.50 at the time of his death. Just before his death he called his father, his sisters and their husbands to his bedside, and requested that his bonds and cash on hand be equally divided between his four heirs. The share belonging to his father he wished managed by his brothers-in-law. The interest would be sufficient to make his father comfortable the remainder of his life, and after his (father's) death should be divided among his three sisters. After the intestate's death, Elder, Heath and Slaughter, without special authority from the wives of Elder and Heath, agreed that the bonds and money should be divided, that Slaughter should administer for the purpose of collecting the notes and accounts only, and as fast as collected he should pay over to each heir his or her share, first paying burial expenses out of cash on hand, reserving enough of the money collected to pay expenses of administration; that he should only receive the ordinary commissions for receiving and paying out, collection of notes and accounts, and the usual commission for the selling or turning over the land in kind; that he should receive no compensation for turning over the land and money on hand at the time of intestate's death, and should in good faith carry out the wishes of the intestate expressed on his death-bed. Elder and Heath, relying on his good faith and on the ordinary to require a sufficient bond, did not know, until Slaughter had received permanent letters, of the insufficiency of the bond. Slaughter ignored and violated the agreement under which he was appointed, by refusing to turn over the share in bonds and money to T. J. Sanders. He also refused to turn over to Mrs. Elder and Mrs. Heath their shares of money collected, though there is no necessity for his keeping it. He has refused and failed to

sell the gold watch and chain, office chair and table and library, of the value of $150, and has sold the pistol at private sale, and now claims commission on sale of the estate in his hands. The advertisement of the lands does not fully describe them, not setting forth the improvements or desirable qualities. Several of the tracts of land and town lots have dwellings, out-houses and other improvements upon them. The order of sale was improvidently granted by the ordinary and [obtained] by the fraudulent representations of the administrator that the sale was necessary when it was not. Neither Mrs. Heath, Mrs. Elder nor T. J. Sanders consented to the sale of the land, nor authorized any one to consent for them. Cornelius Sanders was a half-brother, on the father's side, of the intestate. It is a tradition in the family that he moved to Texas and died there more than forty years ago, and no information as to his widow or any child, if he ever had any, has been received since his death. Pound, one of the administrator's sureties, returns for taxes $4,138, and Mallet, the other, $7,950.

For the defendant it appeared: Mallet is worth $15,000 above all liabilities, and Pound $8,000. The ordinary was satisfied of the truth of the application of the administrator for leave to sell, has personally investigated the accounts of the intestate, is acquainted with many of the parties owing them, and in his opinion not more than $1,000 could be collected on them. The realty of intestate could not be divided in kind. The administrator stated to certain affiants that he would not buy the lands of the intestate, nor allow any one to do so for him. The ordinary, at the request of the administrator, wrote out the advertisement for the sale, and the administrator did not know what it was until he saw it in print. The administrator and his sureties are men of character and means, and the ordinary considers the bond sufficient, but, if upon investigation he should

find it insufficient, would have it strengthened. Upon the application of Heath and Elder the administrator proposed to give additional security, but the ordinary told him he need not do so until the application was heard. The applicants dismissed the application without a hearing. T. J. Sanders is not capable of managing property of any considerable amount, nor of making contracts touching the same. The administrator is upright, honest, deserving the confidence of the public, sober, of good financial standing and of unimpeachable character. Elder stated that the commissions of the administrator were causing them to fight the case. The pistol mentioned was sold at private sale, but for more than it was worth, and Heath, Elder and their wives expressed themselves as satisfied with the sale. Heath and Elder asked Slaughter if he would not take the administration for less than commissions allowed by law, and Slaughter refused, giving as his reason that there would be much work in collecting the notes and accounts; and Heath and Elder consented, as Gibson would not do it for less. Slaughter never declared he would keep the estate in litigation for ten years. He has the watch and chain, office chair and table and library of the intestate, because he understood the heirs wished him to hold them, so as to keep them among the distributees of the estate. The person who rents the house of T. J. Sanders is willing and proposed to board him for the rent, which proposition Sanders seemed anxious to accept, but for some cause did not do so. A few weeks ago Heath and Elder asked Slaughter to divide the bonds, which Slaughter said he was ready to do. They then asked that the money be divided, and Slaughter said he would divide all the money on the first Monday in November, seeing no need of two divisions by dividing the small amount now on hand and making another division in November. Heath and

Elder said he must divide the money then or the land should not sell. They asked that the share of T. J. Sanders be turned over to them, which Slaughter refused to do, saying that Sanders was incapable of attending to it, but that he would advance Sanders money for board or any other expenses. The appraisers returned the notes of the estate as being $10,000, but this was not in their opinion the actual value, and they do not believe them to be worth $1,000, and if suit should be brought to collect the notes and accounts, very little could be collected ; by proper indulgence $1,000 may be collected. The intestate's tax returns for 1890 amounted to $5,076. Upon the petition of Heath, Elder and Slaughter, commissioners were appointed to examine T. J. Sanders as to his competency to manage his affairs.

PRESTON, GILES & POLHILL, for plaintiffs.

HALL & HAMMOND and WRIGHT & BECK, for defendant.